Argued and submitted October 20, 2011, reversed and remanded
December 5, 2012

In the Matter of the Compensation of
Ernesto R. Armenta, Claimant.

Ernesto R. ARMENTA,
*Petitioner,*

*v.*

PCC STRUCTURAL, INC.,
*Respondent.*

Workers' Compensation Board
0701193; A141790

292 P3d 573

Donald M. Hooton argued the cause and filed the briefs for petitioner.

P.K. Runkles-Pearson argued the cause for respondent. With her on the brief was Stoel Rives LLP.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Claimant seeks judicial review of an order of the Workers' Compensation Board (the board) upholding employer's denial of occupational disease claims for cervical radiculopathy and lumbar radiculopathy. Claimant contends that the board erred in finding that an expert opinion admitted into evidence for purposes of rebuttal did not address any condition at issue and therefore would not be considered in determining whether claimant's work activities were the major contributing cause of his claimed conditions. Specifically, claimant asserts that, although the expert addressed claimant's alleged lumbar radiculopathy and its cause, the board unreasonably found otherwise and thereby erred in misinterpreting the expert's opinion and disregarding it as rebuttal evidence. We review the board's order for substantial evidence and errors of law, and to determine whether its analysis comports with substantial reason. ORS 656.298(7); ORS 183.482(8); *SAIF v. Martinez*, 219 Or App 182, 184, 182 P3d 873 (2008). For the reasons set forth below, we conclude that the board erred in disregarding claimant's rebuttal evidence and, accordingly, reverse and remand for reconsideration.

Employer is in the business of metal fabrication, and claimant began working at its plant on September 25, 2000. Before working for employer, claimant had been employed briefly as a cannery supervisor and for 10 years as a punch-press operator with some limited, light grinding duties. Claimant began work in employer's "large parts" division as a belt grinder—grinding large pieces of metal by hand and with the aid of machinery. After three years, he transitioned to a position working with titanium, performing similar work on both large and small parts. Claimant's work activity throughout the course of his employment involved continuous exposure to vibrations, repeated bending and stooping, relatively heavy lifting, and use of substantial physical force to control the grinders, metal parts, and hoists used to lift them. Claimant often worked between 10 and 12 hours per day and testified, simply, that it was "[h]eavy work."

Approximately three years after beginning work for employer, claimant began to experience pain in his arms and

legs, and then eventually in his neck, shoulders, and lower back. Assuming that it would subside naturally, claimant did not seek treatment for approximately two years; however, in December 2005, he reported his symptoms to Dr. Harvey. After a follow-up visit on January 5, 2006, Harvey diagnosed claimant with cervical radiculopathy, released him from work due to his medical condition, and noted that, in addition to pain, claimant was experiencing numbness radiating into his right arm. A subsequent MRI of claimant's cervical spine revealed a posterior disc protrusion at C4-5, mild cervical spondylosis, and bony narrowing of the right C5-6 nerve root canal. Claimant continued to obtain treatment from Harvey through April 2006, participating in physical therapy, taking multiple medications, and receiving a series of epidural steroid injections that, for the most part, failed to alleviate his symptoms. During the same period of time, claimant additionally complained of weakness in his thighs, pain in his right leg, and pain in both hips. Harvey opined that claimant's condition "seem[ed] to be work related."

After filing an initial workers' compensation claim under an industrial injury theory for the herniated disc at C4-5,[1] claimant was referred by employer to Dr. Rabie at an occupational health clinic. Rabie initially addressed claimant's herniated disc and related injury claim, diagnosing cervical radiculopathy due to the herniated disc at C4-5. Thereafter, Rabie continued to treat claimant, diagnosed lumbar radiculopathy in addition to cervical radiculopathy, and referred him to an outpatient neurosurgery consultation with physician's assistant Musacchio. On May 18, 2006, Musacchio identified claimant's condition as "[c]ervical lumbar radiculopathy" and recommended cervical and lumbar MRIs as well as consultation with a neurosurgeon.

In the course of evaluating claimant's industrial injury claim, employer wrote to Rabie requesting information pertaining to compensability. Rabie recommended an independent medical examination (IME), and, on May 24,

---

[1] That injury claim was denied on June 2, 2006, and is not at issue here. This judicial review relates exclusively to claimant's subsequent occupational disease claims for cervical and lumbar radiculopathies, although, as evidenced below, claimant's assignments of error primarily give rise to analysis of his claim for lumbar radiculopathy.

2006, claimant reported to Dr. Graham for an IME. At that time, claimant reported neck pain, bilateral shoulder tightness, lower back pain, and intermittent numbness both in his right arm and running down his right leg into his heel. While he did not have the benefit of cervical and lumbar MRI scans taken a week later pursuant to Musacchio's recommendation, Graham opined that there were "no objective findings consistent with a radiculopathy" and attributed claimant's symptoms to preexisting degenerative disc disease. Addressing the industrial injury claim, he ultimately opined that claimant's symptoms were not caused by "a work injury in December of 2005." Five days later, on May 29, 2006, Rabie concurred with Graham's "diagnoses, physical findings and conclusions" by checking a box on a form letter provided by employer.[2]

The MRIs of claimant's cervical and lumbar spine recommended by Musacchio were conducted on May 31, 2006. The images of claimant's lumbar spine revealed "[m]ultilevel degenerative disc disease at contiguous disc levels from L3 to S1" and "disc bulging and a posterior right paracentral disc protrusion that results in severe (50%) central canal stenosis with focal narrowing of the right lateral recess and potential compression of the right I nerve root" at L4-5.

Claimant subsequently met with a neurosurgeon, Dr. Zelaya, pursuant to Musacchio's recommendation. On June 30, 2006, Zelaya advised against surgical intervention and opined as follows regarding claimant's lumbar spine: "In the lumbar area, * * * [claimant] has pretty significant degenerative changes at L5-S1 where the disk is collapsed, and at L4-5 there is a bony spur centrally, but it does not seem to be putting pressure * * * on the nerves." Claimant then met with Dr. Ono for a second opinion on August 31, 2006. Ono opined that claimant "probably has fibromyalgia rather than radiculopathy" and ordered x-rays which showed significant degenerative changes in claimant's

---

[2] As claimant notes, that concurrence is inconsistent with Rabie's diagnoses of lumbar radiculopathy and cervical radiculopathy—the same diagnoses, as set forth below, regarding which claimant introduced the rebuttal evidence at issue on review.

lumbar spine. Notwithstanding the x-rays, Ono adhered to his probable diagnosis of fibromyalgia.

Claimant continued treatment with Rabie, who adhered to his diagnoses of cervical radiculopathy and lumbar radiculopathy, opining that an underlying cause was degenerative disc disease. On January 11, 2007, Rabie spoke with employer and opined—as reflected in a chart note documenting the telephone conversation—that degenerative disc disease in the cervical and lumbar spine is an "intrinsic condition not caused by or pathologically accelerated by work activity." He further opined that claimant's condition was in part caused by work activity, stating, regarding claimant's occupational disease claims, that "this IS a combined condition in which work combined with [degenerative disc disease] to cause [the] current condition * * *." (Uppercase in original.) He stated that the major contributing cause of claimant's combined condition was "progressive ongoing [degenerative disc disease] in both segments of [the] spine."

On February 13, 2007, employer denied compensability of claimant's occupational disease claims for cervical radiculopathy and lumbar radiculopathy. Claimant requested a hearing, which commenced on May 16, 2007. At the hearing, the administrative law judge (ALJ) admitted an employer-prepared summary of Rabie's findings and opinions. Rabie had signed the summary the day before the hearing, reaffirming his diagnoses of cervical radiculopathy and lumbar radiculopathy and his opinion that those conditions were caused by a combination of degenerative disc disease and claimant's work activities. In addition, Rabie opined that claimant's degenerative disc disease "has resulted in disc bulges, which in turn *compress his nerve roots causing pain (radiculopathy)*" (emphasis added) and that the underlying degenerative disc disease resulted "from a combination of [claimant's] particular genetic make up, smoking habit, and age[.]" He further opined that claimant's degenerative disc disease had "not been caused by or pathologically worsened by his work activities" and rejected Ono's tentative diagnosis of fibromyalgia.

Claimant, bearing the burden of proof in an occupational disease claim, ORS 656.266, sought a

continuance in order to rebut Rabie's opinion with a report from Dr. Gritzka, with whom he had an evaluation scheduled in early July. After denying claimant's request for a continuance, the ALJ granted claimant's request to admit Gritzka's report after the hearing for the sole purpose of rebutting Rabie's opinion. *See* OAR 438-007-0023 (party bearing the burden of proof on an issue is entitled to the "last presentation of evidence and argument on the issue"). In so doing, the ALJ limited claimant's presentation of Gritzka's opinion to "actual rebuttal"—specifically limiting consideration of the report "to the issues of cervical and lumbar radiculopathy."

Gritzka evaluated claimant on July 5, 2007, with claimant continuing to report substantial neck and back pain along with pain and numbness radiating into his arms and right leg. Gritzka performed a physical examination and reviewed claimant's medical records, most notably the MRI of claimant's lumbar spine conducted on May 31, 2006. Regarding that MRI, Gritzka stated, "This study was interpreted by the radiologist to show potential *compression of the L5 nerve root*; I agree with that interpretation." (Emphasis added.) Ultimately, Gritzka provided the following diagnosis:

"1. Mild cervical degenerative spondylosis with C4-5 intervertebral disk protrusion.

"2. Lumbar degenerative spondylosis.

"a. Moderate to moderately severe intervertebral disk degeneration and disk space collapse [at] L5-S1.

"b. Intervertebral disk herniation [at] L4-5 lateralized primarily to the right.

"Based on the evaluation today, [claimant] does not have a cervical radiculopathy. He does have pain in his right lower extremity that is most probably related to the intervertebral disk herniation at L4-5 lateralized to the right and compressing the *right L5 nerve root condition*."

(Emphasis added.) Gritzka thus disagreed with Rabie as to the existence of cervical radiculopathy but diagnosed, using terminology nearly identical to Rabie's as discussed further below, lumbar radiculopathy related to degenerative disc disease. Gritzka further opined, rebutting Rabie's

opinion as to causation, that "it is conclusory to attribute [claimant's] cervical and lumbar complaints * * * [to] aging and 'genetic factors.'" Rather, Gritzka offered an opinion as to causation similar to Harvey's, albeit explained in more detail, concluding, "In my opinion, more probably than not, the major contributing cause of [claimant's] cervical condition and lumbar condition [is] his work activities operating a grinder for [employer]." He opined that claimant's work activities did in fact "contribute[ ] to a pathological worsening of" degenerative disc disease ("[t]o the extent that [claimant] had 'preexisting degenerative disk disease in his cervical and/or lumbar spine'") and, addressing claimant's lumbar condition specifically, opined that "the major contributing cause of [claimant's] lumbar condition and need for treatment [is] his work activities over time at [employer's plant]."[3]

The ALJ admitted Gritzka's report into evidence; however, he determined that Gritzka "did not diagnose lumbar radiculopathy or address the cause of such a condition" and concluded that "Gritzka's opinions regarding the cause of claimant's lumbar or cervical conditions were not directed at his radiculopathies * * *. Therefore, they will not be addressed." Ultimately, in an opinion and order issued on July 16, 2008, the ALJ found that there was "no persuasive expert medical evidence supporting claimant's contention that his work activities were the major contributing cause of his cervical and lumbar radiculopathies[,]" and approved employer's denials of both occupational disease claims.

---

[3] Gritzka also discussed "vibrational occupational hand syndrome" in support of his opinion as to causation. On that point, he stated:

"The intervertebral disk herniation at C4-5, more probably than not, is the result of vibration transmitted through [claimant's] upper extremities to his cervical spine. With regard to [claimant's] low back, he describes first, that his grinder sometimes would buck or jerk, shaking his whole body and also that he had to operate the grinder sometimes in a stooped over or ben[t] position. Flexion of the lumbar spine compresses the L4-5 and L5-S1 intervertebral disk spaces particularly. In a situation where one would work in a position of lumbar flexion and was subjected to whole[-]body vibration and an occasional jerking episode, biomechanically one would expect that forces would be concentrated at the L4-5 and L5-S1 levels that would lead, over time, to (at least) worsening of degenerative changes and disk herniations at L4-5 and L5-S1."

The board adopted and affirmed the ALJ's order, further stating, regarding the ALJ's treatment of Gritzka's report, "Based on the ALJ's express language that the rebuttal report was limited to addressing claimant's cervical and lumbar radiculopathies, we conclude that it was within the ALJ's discretion[4] to exclude evidence that did not fall within the limited purpose for which the record remained open." (Citations omitted.) Beyond discussion of procedural matters not at issue on review, the board did not provide any additional explanation regarding its decision not to consider Gritzka's opinion or its determination that Gritzka's opinion did not address claimant's alleged cervical or lumbar radiculopathies.

On review, claimant argues first that Gritzka in fact diagnosed lumbar radiculopathy given his "finding of nerve root compression in the lumbar spine."[5] Claimant further challenges the board's adoption of the ALJ's determination that Gritzka "offered no opinions regarding the cause of claimant's alleged lumbar radiculopathy[,]" contending that Gritzka addressed, diagnosed, and provided an opinion as to causation of that condition. Accordingly, claimant argues, the board erred in adopting the ALJ's finding that Gritzka's report did not address any condition to which rebuttal evidence was limited, *i.e.*, cervical or lumbar radiculopathy, and thus erred in failing to consider Gritzka's opinion as rebuttal to Rabie's opinion when determining whether the record, "viewed as a whole," ORS 183.482(8)(c), demonstrated that claimant's work activities were the major contributing

---

[4] As noted, Gritzka's report was not "exclude[d]" by the ALJ, but rather was simply not considered—based on an understanding of its contents—in determining the major contributing cause of claimant's conditions. Accordingly, the board erroneously addressed the ALJ's treatment of Gritzka's opinion as an evidentiary ruling subject to an abuse of discretion standard. We address the standard of review applicable to this case in detail below.

[5] Claimant concedes that Gritzka did not diagnose cervical radiculopathy. However, he argues that, even with regard to cervical radiculopathy, the report falls within the scope of the rebuttal evidence permitted by the ALJ given that Gritzka addressed the cause of the degenerative changes underlying claimant's cervical condition. In other words, claimant argues that Gritzka provided an alternative explanation as to causation of the same degenerative process identified by Rabie as the cause of claimant's cervical radiculopathy. We need not decide that issue, as we conclude that, in any event, Gritzka directly addressed claimant's alleged lumbar radiculopathy.

cause of his claimed conditions. Employer responds that Gritzka made only one "isolated comment" regarding a compressed nerve in claimant's lumbar spine[6] and argues that he "did not directly address the issue of whether there was a work-related cause for [claimant's] cervical or lumbar radiculopathy." Beyond disputing claimant's assertions regarding the substance of Gritzka's opinion, employer contends that the board's treatment of Gritzka's opinion is governed on review by an abuse of discretion standard and that any error in disregarding the opinion was harmless and should be treated as such. We agree with claimant.

We first clarify the applicable standard of review. Employer evaluates the board's treatment of Gritzka's opinion under an abuse of discretion standard, likening it—consistent with the board's order—to adoption of an evidentiary ruling made by the ALJ. However, Gritzka's opinion was in fact admitted into evidence. This was not a situation in which the ALJ could have exercised discretion to reject certain aspects of Gritzka's report. The proper question on review is whether the board's interpretation of Gritzka's report was a reasonable one. *See SAIF v. Pepperling*, 237 Or App 79, 84-85, 238 P3d 1013 (2010) ("In reviewing the board's evaluation of [an expert's] opinion, we do not substitute our judgment for that of the board; rather, we determine whether the board's evaluation of that evidence was *reasonable*." (Citation omitted; emphasis added.)); *see also Asten-Hill Co. v. Armstrong*, 100 Or App 559, 562-63, 787 P2d 890 (1990) (concluding that the board "unreasonably" "misread" and "substantially misstated" an expert's statements, and further identifying "[t]he only reasonable reading" of that expert's opinion); *SAIF v. Paxton*, 154 Or App 259, 263-65, 959 P2d 634 (1998) (the board's finding was not supported by substantial evidence where it unreasonably misinterpreted an expert's opinion regarding the cause of the claimant's hearing loss); *Kenimer v. SAIF*,

---

[6] Insofar as the number of Gritzka's references to spinal nerve root compression is significant, that is simply not the case. Gritzka addressed spinal nerve root compression in reviewing the May 31, 2006, MRI, in concurring with a radiologist's interpretation of that MRI, and in rendering his diagnosis. He also addressed the cause of the pain associated with radiculopathy, as well as the cause of claimant's disc degeneration and other factors underlying and contributing to the alleged lumbar radiculopathy.

183 Or App 131, 138, 51 P3d 632 (2002) (finding "only one reasonable interpretation of the basis for [an expert's] opinion").

We address claimant's assignments of error together, as the resolution of claimant's first assignment of error—that the board erroneously adopted the ALJ's finding that Gritzka did not diagnose claimant with "a lumbar radiculopathy"—is simply one means of resolving whether the board ultimately erred in determining that Gritzka did not address any condition within the scope of rebuttal permitted by the ALJ (namely, Rabie's diagnoses of cervical and lumbar radiculopathies). "Radiculopathy" is defined as a "[d]isorder of the spinal nerve roots." *Stedman's Medical Dictionary* 1503 (27th ed 2000). As claimant correctly points out, Rabie's diagnosis of radiculopathy—that is, "disc bulges, which in turn compress [claimant's] nerve roots causing pain (radiculopathy)"—was addressed directly and unambiguously by Gritzka's report. In evaluating claimant's lumbar MRI and an accompanying radiologist's report, and in formulating his diagnosis, Gritzka addressed "potential compression of the L5 nerve root" and a "right L5 nerve root condition[,]" respectively.

The record thus reflects that, with regard to claimant's lumbar condition, Gritzka's opinion contained prominent language nearly identical to that used by Rabie in referring to radiculopathy. Both physicians referred to pain caused by compression of claimant's spinal nerve roots; Rabie simply included the term "radiculopathy" in parentheses afterward. That one-word parenthetical ultimately constitutes the only discernible difference (excluding theories of causation) between the two experts' language pertaining to claimant's lumbar radiculopathy. There is therefore only one reasonable interpretation of Gritzka's opinion: that it addresses claimant's alleged lumbar radiculopathy. *See Kenimer*, 183 Or App at 138 (finding "only one reasonable interpretation" of an expert's opinion); *cf. Freightliner Corp. v. Arnold*, 142 Or App 98, 105, 919 P2d 1192 (1996) (concluding, in the context of causation, that an expert's "testimony as a whole reasonably may be read as [reaching the relevant conclusion]" and "need not be ignored

*merely because it fails to include 'magic words' such as 'major contributing cause'"* (emphasis added)). Gritzka's report thus fell "within the limited purpose for which the record remained open," and the board's unexplained determination to the contrary was not reasonable. Consequently, the board erred in disregarding Gritzka's opinion as medical evidence rebutting Rabie's conclusions as to the cause of claimant's alleged lumbar radiculopathy.[7]

In sum, Gritzka's opinion, at minimum, addressed claimant's alleged lumbar radiculopathy and its cause. The board's determination to the contrary was not reasonable. Accordingly, because we conclude that the board unreasonably misinterpreted Gritzka's opinion and therefore erred in failing to consider it as rebuttal evidence, we reverse and remand for reconsideration. *See, e.g., Asten-Hill*, 100 Or App at 562-63 (reversing and remanding for reconsideration where the board "misread [an expert's] testimony unreasonably"); *Skochenko v. Weyerhaeuser Co.*, 118 Or App 241, 245, 846 P2d 1212 (1993) (citing *Asten-Hill*, 100 Or App 559) ("[W]e cannot say that the Board's misinterpretation of some of the medical evidence did not influence its ultimate conclusion * * *. Accordingly, we must reverse and remand for reconsideration."); *SAIF v. Bryant*, 173 Or App 402, 407-08, 21 P3d 1104 (2001) (reaffirming the principle that we reverse and remand for reconsideration when "the Board's misinterpretation of some of the medical evidence may have influenced its ultimate conclusion" (citations omitted)); *Kenimer*, 183 Or App at 139 (similar).

Reversed and remanded.

---

[7] The board's misinterpretation of Gritzka's opinion is compounded by the fact that radiculopathy is a generalized term that most commonly refers to pain or numbness and can encompass a variety of underlying conditions. In fact, this court has openly debated its status as a "condition," though that is ultimately a question of fact to be decided based on the medical evidence in individual cases. *See Young v. Hermiston Good Samaritan*, 223 Or App 99, 101, 107, 194 P3d 857 (2008) (finding that "radiculopathy," defined by the medical evidence as *"pain that radiates along the course of a nerve root that exits from the spine,"* was a "symptom and not a condition" (emphasis added)); *see also City of Eugene v. McCann*, 248 Or App 527, 536, 273 P3d 348 (2012) (citing *Young* and its definition of radiculopathy in distinguishing "diseases from symptoms"). Gritzka addressed the generalized definition of radiculopathy, did not neglect to address the pain and other symptoms associated with it as a condition, and in effect treated it much like this court (and, notably, the board) did in *Young*, 223 Or App at 101, 107.